UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

DONALD M. BOSWELL                    CIVIL ACTION NO. 11-cv-0739

VERSUS                               JUDGE WALTER

CLAIBORNE PARISH DETENTION           MAGISTRATE JUDGE HORNSBY
CENTER, ET AL

**REPORT AND RECOMMENDATION**

**Introduction**

Donald Boswell ("Plaintiff") is a self-represented inmate.  He alleges in this civil

rights action that officials at the Claiborne Parish Detention Center violated his civil rights

while he was housed at that facility as a pretrial detainee.  This court originally dismissed his

complaint as frivolous.  The Fifth Circuit affirmed the dismissal of several claims (e.g.,

denial of access to the courts, change in custodial status, unsanitary mattress, lack of

treatment for kidney stone pain on June 11, 2010, and failure to provide sanitary supplies and

hygiene products).

The Fifth Circuit found that four specific claims were not frivolous and merited

further proceedings.  Those claims are: (1) strip search conducted by or in front of female

deputies and employees; (2) retaliation upon discovery by officials of Plaintiff's efforts to

contact the FBI and ACLU regarding treatment at the facility; (3) denial of medical attention

and medication for a hernia; and (4) denial of medical care for a head and chest cold that

worsened to bronchitis and walking pneumonia.  Doc. 24; Boswell v. Claiborne Parish Detention Center, 629 Fed. Appx. 580 (5th Cir. 2015).

After remand, this court dismissed all claims against (1) the Claiborne Parish Detention Center, which is not a legal entity, and (2) unspecified "staff" of the Detention Center.  Docs. 36 and 46.  The remaining defendants are Warden Johnny Sumlin, Assistant Warden John Goodwin, and former correctional officer James Banks.  The parties were allowed a reasonable opportunity to conduct discovery, and the three defendants then filed a Motion for Summary Judgment (Doc. 61) that attacks the remaining claims.  For the reasons that follow, it is recommended that the motion be granted in part and denied in part.

**Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a).  A fact is "material" if it might affect the outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986).  A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party.  Anderson, supra; Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 106

S.Ct. 2548 (1986). If the moving party carries his initial burden, the burden then falls upon

the nonmoving party to demonstrate the existence of a genuine dispute of a material fact.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S.Ct. 1348, 1355-56 (1986).

**Background Facts**

Plaintiff was about 37 years old when he was arrested in Webster Parish and indicted

for aggravated rape of a juvenile and indecent behavior with a juvenile.  He eventually

pleaded guilty to attempted aggravated rape and was sentenced to 48 years.  The mother of

the 11-year-old victim had been one of Plaintiff's employees, and she had entrusted her child

to him.  Plaintiff had intercourse with the child while allegedly caring for her.  The direct

appeal decision states that Plaintiff asserted before sentencing and again on appeal that the

11-year-old victim was the aggressor or initiator.  State v. Boswell, 62 So.3d 874 (La. App.

2d Cir. 2011), writ denied, 76 So.3d 1174 (La.).

Plaintiff testified at his deposition that he was arrested and booked in Webster Parish

on October 6, 2009, but he was transferred the next day to the Claiborne Parish Detention

Center.  He stated that he was transferred to the jail in the adjacent parish because he had

served as a volunteer reserve deputy in Webster Parish, and authorities wished to house him

in a protective custody dorm that the Webster jail was lacking.

**Strip Search**

### A. Plaintiff's Allegations

Plaintiff did not complain of a strip search in his original complaint, but he mentioned one in response to a questionnaire from the court that asked for details about his claims.  He stated, when describing a claim about an unsanitary mattress, that on May 13, 2010 several deputies from the Jackson Parish Detention Center joined the Claiborne Parish deputies to conduct a full shakedown of the jail.  Plaintiff wrote that all inmates in his dorm were "stripped naked and told to line up against the wall and we were visually searched."  He added:  "We were searched in front of 6 female deputies who had come into the dorm to see all the naked men."  Doc. 12, p. 36.

### B. Plaintiff's Deposition Testimony; Statement by Richard Walker

Defense counsel took Plaintiff's deposition and asked him about the search.  Plaintiff said that he and his cellmate, another law enforcement officer, were housed in the A-5 dorm, which held protective custody, medical recovery, and other segregated inmates.  About 40 deputies from Jackson Parish came through the dorm and had all of the men "line up against the wall, strip naked."  Deputies then went through all belongings and even cut open all the mattresses.

Plaintiff testified, "All of the female officers that worked there, they all came in the dorm and walked around and lined up over there and watched all the naked men standing up in there."  Plaintiff said there were at least eight female deputies in the room, standing about

20 feet from the men, and the search took about 45 minutes.  Plaintiff was asked if the female deputies were there for any apparent purpose.  He testified that they were not, and they did not help in the search.  He claimed that they were "people out of administration" who didn't even deal with inmates.  "These were people that worked in the office."

Plaintiff said that there was not a body cavity search during the incident, but there was a "bend over and cough search."  He said he believed the women were there when that happened and were in a position to witness it.  Plaintiff was asked what male officers from Claiborne were present.  The only named defendant that he identified was Warden Sumlin.  He said: "There was, I think, Warden Sumlin was there for a minute."  Deposition of Plaintiff, Doc. 61, Exhibit 1, pp. 17-29.[1]

Plaintiff's Memorandum in Opposition (Doc. 66) includes an "Affidavit of Truth" from Richard D. Walker, a former Jackson Parish corrections officer.  The document was not signed under oath before a notary, and it does not state that it is given under penalty of perjury as required by 28 U.S.C. § 1746, so it is probably not competent summary judgment evidence.  Walker states that he was employed by Jackson Parish on May 13, 2010 and went with several other officers from various detention centers to conduct the shakedown.  Walker and other officers searched the property of the offenders while deputies from Claiborne Parish strip searched the inmates.  "The female deputies and female staff from Claiborne

---

[1] The cited page numbers are those of the deposition itself, which appear four-per-page in the Exhibit.

were also present while the offenders were lined up naked against the wall." Walker says that his information "is true to best of my knowledge."

### C. Warden Sumlin's Affidavit

Warden Sumlin testifies in an affidavit that female officers can conduct a strip search or be present to provide security during the strip search of a male inmate, but female officers "would only be used in an emergency or if there were an insufficient number of male corrections officers to perform the search safely." He states that all dorms at the Detention Center are subject to shakedown searches, where the entire dorm and all inmates are searched for contraband, and the searches may include a visual search of the entire body of an inmate. He states that random shakedown searches and visual body inspections are necessary to locate contraband. Sumlin says that he has "no personal knowledge as to whether a shakedown of [Plaintiff's] dorm and cell occurred on May 13, 2010" and that no records are known to exist that show whether a strip search of Plaintiff happened on that date or any other date. Sumlin also "has no recollection of ever being present in a dorm or a cell where [Plaintiff] was subjected to a strip search."

### D. Applicable Law

The Fifth Circuit has addressed the issue of strip searches in the presence of the opposite sex. An early case was Letcher v. Turner, 968 F.2d 508 (5th Cir. 1992) in which the male prisoner alleged the presence of female guards during a strip search that accompanied a lockdown after an organized food throwing incident. The Court endorsed

principles from a prior unpublished decision that no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of female guards is required to protect a legitimate government interest such as maintaining security at a correctional facility.  Defendants pointed to evidence that the search was conducted in a situation where a maximum show of force was required because of unruly behavior.  The Court said there was no factual dispute to cast doubt upon the need for additional security, so it affirmed summary judgment for the defendants.

The male prisoner in Moore v. Carwell, 168 F.3d 234 (5th Cir. 1999) alleged that a female officer performed multiple strip and body cavity searches when there were no emergency circumstances justifying the searches and male guards were available.  The district court had dismissed a Fourth Amendment claim, citing Letcher, but the Moore panel emphasized that Letcher held that the mere presence of female officers during a strip search during *emergency circumstances* did not violate the Fourth Amendment.  Given the quite different allegations in Moore, the Court held that the claim was not frivolous.

After a rash of murders, stabbings, and suicides, the warden of the Louisiana State Penitentiary ordered a prison-wide shakedown of all prisoners, which included a visual body cavity search.  Additional officers were brought in, and the prisoners were searched in small groups over the course of two and one-half days.  Several non-searching officers were present in the room for safety purposes, as well as two news media members, the Secretary of the DOC, and his pilot.  The Court held in Elliott v. Lynn, 38 F.3d 188 (5th Cir. 1994) that

the search was constitutionally reasonable in the context of the state of emergency, even though the searches were conducted *en mass* in a non-private area in the presence of non-essential personnel.  The Elliott opinion does not appear to mention the gender of any of the officers, but Oliver v. Scott, 276 F.3d 736, 745 (5th Cir. 2002) stated that Elliott held that the emergency circumstances justified a shakedown that included mass strip searches "in front of female employees."

A Texas prisoner alleged that he was subjected to strip and visual body cavity searches in the presence of female prison employees.  The Fifth Circuit explained that the district court must balance the need for the searches against the invasion of personal rights that the searches entailed by considering the scope of the intrusions, the manner in which they were conducted, the justification for them, and the places in which they were conducted.  Waddleton v. Jackson, 445 Fed. Appx. 808 (5th Cir. 2011).  The prisoner alleged that there was no justification for the searches, so the Court held that dismissal at the screening stage was premature.

### E. Claim Against Warden Sumlin

The Fifth Circuit has not held that strip searches in the presence of female employees are always allowed.  There is still a burden on prison officials to show that the search was reasonable.  The Court has noted that the burden on the officials may be light, but it is a burden they must nevertheless bear.  Waddleton, 445 Fed. Appx. at 809.

A court considering a motion for summary judgment must consider all facts and evidence in the light most favorable to the nonmoving party. <u>Haverda v. Hays County</u>, 723 F.3d 586, 591 (5th Cir. 2013). A court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. <u>Id</u>. Plaintiff's version of the facts are set forth under oath in his deposition. There is no evidence to compete with his testimony that female officers and even female staff employees were present during the course of the allegedly 45-minute search, during which Plaintiff and the other men were naked. Even if there were competing evidence from the movants, Plaintiff's sworn version of the facts controls for summary judgment purposes.

Warden Sumlin states general concerns about contraband, and that may be sufficient to justify a strip search conducted in a reasonable manner. But Plaintiff has presented uncontested evidence that this lengthy strip search was carried out within close proximity of several female employees who were not present because they were needed to provide security or were conducting any other work-related duty. Plaintiff describes the women, some of them office workers rather than correctional officers, as simply coming to look at the naked men. He also testified that Sumlin was present, if only for a minute.

Plaintiff's uncontested description of the method in which the search was executed is sufficient to defeat summary judgment on this claim; a reasonable juror could find from that evidence that the search was unreasonable and violated the Fourth Amendment under the principles established by the Fifth Circuit. And Plaintiff's evidence, although minimal,

that Warden Sumlin was aware of the manner in which the searches were being conducted is sufficient to make out a claim against him. <u>Johnson v. Scott</u>, 31 Fed. Appx. 836 (5th Cir. 2002) (prisoner stated claim against warden when she alleged warden was aware of intrusive and embarrassing manner searches were conducted in view of male officers).  The evidence is also sufficient to overcome the qualified immunity defense, given the Fifth Circuit cases that clearly establish that a Fourth Amendment violation may occur if a strip search is performed unreasonably in the presence of the opposite sex.  Accordingly, Warden Sumlin is not entitled to summary judgment on this claim.

### F. Claim Against Goodwin and Banks

Assistant Warden John Goodwin and former officer James Banks are entitled to summary judgment on this claim.  Plaintiff did not mention either of them in his general description of the strip search.  Counsel asked Plaintiff, at the end of his deposition, why he had named Assistant Warden Goodwin as a defendant when Goodwin's name had not come up in their discussion.  Plaintiff said that he was told by an inmate counsel that he needed to put Goodwin's name on the complaint because he was the assistant warden.  Defense counsel said that he did not see a factual complaint that Goodwin personally did anything wrong.  Plaintiff agreed and said he could not think of one time Goodwin was not cordial with him.

Plaintiff said inmate counsel told him he needed to add Major Banks as a defendant because Banks was head of security.  Counsel asked if Banks was in charge of the strip

search, and Plaintiff said he was not.  When asked if Banks was even there, Plaintiff mustered only, "I think so."

Supervisors are not liable under 42 U.S.C. § 1983 based on their mere management position or any theory of vicarious liability for the actions of subordinates.  The plaintiff must show independent liability of the supervisor.  Thompkins v. Belt, 828 F.2d 298, 303-04 (5th Cir. 1987).  There is not sufficient evidence from which a reasonable juror could find that either Goodwin or Banks was responsible for, or aware of and able to prevent, the manner in which the strip search was allegedly conducted.  Both men are entitled to summary judgment on this claim.

### G. Policy Violations

A claim for relief under Section 1983 must allege the deprivation of a right secured by the Constitution or the laws of the United States.  Calhoun v. Hargrove, 312 F.3d 730, 734 (5th Cir. 2002).  Plaintiff argues in his briefs that the method by which the searches were conducted violated DOC policy.  Mere violations of state law or prison policy, however, are not violations of the Constitution or federal law, so they fail to state a claim under Section 1983.  The Fifth Circuit has stated that a prisoner's "contention that the searches violated prison policies and regulations ... did not state a claim for relief because violations of prison rules do not alone rise to the level of constitutional violations and, therefore, such claims are not actionable under § 1983." Scheidel v. Secretary of Public Safety & Corrections, 561 Fed. Appx. 426 (5th Cir. 2014).

**H. Limitation on Recovery**

Plaintiff seeks to recover compensatory damages.  Defendants argue that those damages, with respect to the strip search claim, are barred by 42 U.S.C. § 1997e(e)'s provision that no federal civil action may be brought by a prisoner " for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)."  There is no allegation that Plaintiff suffered a physical injury due to the search.  Section 2246 defines sexual act to mean certain forms of genital contact, penetration, or touching that are not alleged in this cases.[2]  Accordingly, the statutory limitation is applicable.

The limitation applies to all federal civil actions in which a prisoner alleges a constitutional violation, including First Amendment or other claims that are not usually

_____

[2] 18 U.S.C. § 2246(2) provides:

the term "sexual act" means--

(A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;

(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

accompanied by physical injury.  Geiger v. Jowers, 404 F.3d 371, 374-75 (5th Cir. 2005).

Accordingly, the only forms of relief available to Plaintiff, if he prevails on the merits of this

claim, are nominal and punitive damages; they are not barred by the physical injury

requirement.  Hutchins v. McDaniels, 512 F.3d 193, 197-98 (5th Cir. 2007); Boyd v. Driver,

495 Fed. Appx. 518, 524 (5th Cir. 2012).  Nominal damages are typically $1.00 or a similar

representative award, and punitive damages are available only if the judge or jury that

decides the case finds that the defendant's conduct is motivated by evil intent or reckless or

callous indifference to constitutional rights.  Boyd, 495 Fed. Appx. At 524, citing Williams

v. Kaufman County, 352 F.3d 994, 1015 (5th Cir. 2003).  The standard is demanding, and

awards are not common.

**Retaliation**

### A.  Introduction

Plaintiff alleges that Detention Center officials retaliated against him because he tried

to send complaints to the FBI and ACLU about his conditions of confinement.  Defendants

attack the claim on summary judgment.  They argue that it is untimely and that they are

entitled to qualified immunity.

### B.  Applicable Law

Officials may not retaliate against a prisoner for exercising his First Amendment right

of access to the courts, or for complaining through proper channels about a guard's

misconduct.  Morris v. Powell, 449 F.3d 682, 684 (5th Cir. 2006); Woods v. Smith, 60 F.3d

1161, 1164 (5th Cir.1995).  To state a Section 1983 retaliation claim, an inmate must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.  Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999).

Mere conclusory allegations of retaliation are insufficient. Id. The inmate must produce direct evidence of motivation or a chronology of events from which retaliation may plausibly be inferred.  Jones, 188 F.3d at 325; Woods, 60 F.3d at 1164.  The inmate must show that "but for" some retaliatory motive, the complained of adverse action would not have occurred. Woods, 60 F.3d at 1166.

The complained-of adverse action must be more than *de minimis* to support a claim of retaliation in the prison context. Morris, 449 F.3d at 684–85.   Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights. Id. at 686.  For example, an inmate's job transfer from the commissary to the kitchen was *de minimis*, while a transfer to a more dangerous prison was not. Id. at 687. In another case,  27 days of commissary and cell restrictions were deemed actionable.  Hart v. Hairston, 343 F.3d 762 (5th Cir. 2003).

### C.  Relevant Facts

Timeliness is an issue, so the filing date of this civil action is important.  A mailbox rule applies to Section 1983 complaints filed by pro se prisoners and deems them filed when the prisoner tenders the item to prison officials for mailing.  Cooper v. Brookshire, 70 F.3d

377, 379 (5th Cir.1995).   Plaintiff did not sign and date his original complaint, but the envelope it was mailed in bears a David Wade Correctional Center mailroom stamp and a USPS postmark.  Both are dated May 5, 2011.  That is the earliest evidence of tendering, so it is the date the court will use as the commencement of this civil action for prescription purposes.  Plaintiff admits that he did not file an ARP grievance, so there was no related tolling, which means that events that happened before May 5, 2010 are potentially untimely.

Plaintiff alleged in his original complaint that on January 13, 2010 he was called to Warden Sumlin's office.  Sumlin confronted Plaintiff with a package addressed to Plaintiff that contained legal papers regarding his child custody dispute and a letter and documents concerning his complaint to the ACLU.  Plaintiff alleged that Sumlin said Plaintiff would not be allowed to have the papers, which deprived him of his right to file a formal complaint against the facility.  Plaintiff added that he was then threatened in an unspecified way.  The court ordered Plaintiff to provide additional details about his claims, and he filed an amended complaint that set forth several pages of allegations under the heading of retaliation.  Doc. 12, p. 24-31.

Plaintiff alleged in the more detailed account that he had two sets of ACLU complaint forms mailed to him, but the mail room employees alerted Warden Sumlin.  An officer handcuffed and shackled Plaintiff and delivered him to the security office.  Warden Sumlin was there with Plaintiff's package of legal mail and demanded to know, "What kind of f***ing games are you playing with me?"  He then dumped out the contents of the package,

which included the ACLU complaint forms and a letter that stated Plaintiff's family had been in touch with the FBI about his treatment at the detention center.  Sumlin allegedly said, "So you think you want to tell on me, huh?"  Sumlin allowed Plaintiff to keep some of the contents of the package but told him he could not have the ACLU papers because they would not help his case or cause.  Sumlin warned Plaintiff not to try anything else like that because he would be watching Plaintiff for the rest of his stay.

Plaintiff alleges that he immediately, on return to his cell, wrote a letter to his family, explained those events, and asked them to contact the FBI.  Plaintiff alleges that officials opened the mail, which resulted in him being pulled from his bunk the next morning and told to put all his belongings in a black garbage bag.  Plaintiff asked the officer what was happening and why, and the officer said Plaintiff knew exactly what this was about and deserved whatever he got.  The officer took the bag of property out of the dorm and dumped the contents on the floor.  Two officers and two trustees went through the items.

Plaintiff alleged that the property included discovery papers from his criminal trial, which allowed the other inmates to see the nature of the child rape charges against him, and the inmates spread that news around the prison.  Plaintiff alleges that this resulted in threats of harm and death.  The officers did not find any incriminating notes about the FBI contact, which Plaintiff says they were searching for, so the officers allegedly began to damage the property.  Plaintiff alleges that they destroyed $85 worth of canteen food and hygiene items, spread strawberry jelly on his discovery papers and other property, used scissors to destroy

an air pillow he purchased from the canteen, and threw all of the property in a storage building where it was left until Plaintiff left the Detention Center on July 19, 2010.

Plaintiff alleges that he was then placed in an isolation/suicide cell with an inmate who was a violent and open homosexual infected with Hepatitis C. Plaintiff was shoved into the cell, and he broke his wrist when he fell against the bunk bed ladder. Later that day, he was written up for two rule violations (contraband and general prohibited behavior) by Sgt. Lee. The charges stemmed from an allegation that Plaintiff possessed a pair of women's blue underwear. A disciplinary board found him guilty of both charges. (Plaintiff alleges that he had possessed the underwear since he arrived at the Detention Center and that an officer later admitted that item of clothing was stamped "mens" on a tag.) His punishment was the loss of all privileges, including canteen, phone, and contact visits. His visitation time was cut in half. Plaintiff alleges that his mother was treated harshly and subjected to sexual mishandling when she came to visit him on February 5, 2010.

An inmate painted the inside of Plaintiff's cell door on March 12, 2010. Plaintiff alleged that paint fumes in the unventilated area burned his eyes and caused a migraine headache for two weeks. Warden Sumlin had ordered his deputies to never let Plaintiff out of that cell, and an officer who Plaintiff asked for relief slammed the door in his face. All events described thus far happened more than one year before the complaint was filed on May 5, 2011.

Plaintiff alleges he was left on extended lockdown in an isolation/suicide cell for an additional five and one-half months.  He was never allowed to leave his cell without being in five-point restraints, except to take a shower.  He found insects, debris, and what looked like pubic hair in his food.  An officer told Plaintiff's cellmate that Plaintiff's protective custody status had been changed from former law enforcement to homosexual.

Plaintiff alleges that Warden Sumlin told his deputies to not speak to Plaintiff or do him any favors.  Plaintiff was denied a haircut and shave for 10 weeks at a time, even though it violated jail policy, and his family visits would be delayed when, suddenly, he would be ordered to shave.

Plaintiff alleges that on May 7, 2010 he was taken to the nurse, but an officer accused him of playing games and dragged him back to the housing area.  The officer placed Plaintiff in a different cell, with a prisoner who Plaintiff describes as a very violent mental patient who would go into raging violent fits of anger.  That cellmate made a shank on May 25, 2010 and once threatened to kill Plaintiff with it.  Plaintiff reported this up the chain to Warden Sumlin, who ordered that Plaintiff be shaken down.  Plaintiff alleges that the cellmate admitted to having the shank and planning to kill Plaintiff, but nothing was done to protect Plaintiff.

Plaintiff and that cellmate were moved to an open bar cell on May 26, 2010.  The cellmate began "bar fighting" with inmates in the common area.  Those inmates retaliated by throwing urine and Kool-Aid in the cell, which soaked Plaintiff's clothes, bedding, and

Bible.  Plaintiff reported this to an officer the next day, but the officer only laughed in his face.

Plaintiff alleges that a large fight broke out on May 30, 2010, and four of the fighting inmates were placed in his cell.  Plaintiff told the officer that he was in protective custody, but the officer said that the warden had taken Plaintiff off of that status because he thought Plaintiff was "playing games."  Another officer confirmed the next day that Plaintiff had lost his protective custody status per Warden Sumlin.

Those inmates were removed, but on June 18, 2010 a very aggressive and violent mental health patient, known to attack other people for no reason, was placed in the cell with Plaintiff.  Plaintiff alleges that he was too sick and weak to defend himself and could not sleep for fear of an attack.  He complained to deputies, but they all said that it was what he deserved.

Defense counsel took Plaintiff's deposition and pointed to these allegations.  Plaintiff offered similar testimony.  He said his initial disciplinary sentence was 30 days, but Warden Sumlin told him that he was going to stay back there until he was ready, which resulted in Plaintiff staying there for five and one-half months.  Plaintiff testified that a Sgt. Hudson told him that the things that had happened to him were because of the FBI and ACLU complaints. Plaintiff particularly claimed that the false disciplinary charge was retaliatory.  When asked about being housed with a homosexual, Plaintiff was less specific.  He said an officer told

him it was done "on purpose" because "we hate you" and "we'll show you."  Doc. 61, Exhibit 1, pp. 30-44.

### D. Analysis

A Section 1983 claim brought by a Louisiana prisoner is governed by a one-year prescriptive period.  Elzy v. Roberson, 868 F.2d 793 (5th Cir. 1989).  The cause of action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action.  Lavellee v. Listi, 611 F.2d 1129, 1131 (5th Cir. 1980); Crane v. Childers, 2016 WL 3689708 (5th Cir. 2016).  The filing of an ARP grievance can toll the limitations period, but Plaintiff admits that he did not file a grievance.  (Defendants state that they are not now raising an exhaustion defense due to factual disputes on the availability of the remedy at the Detention Center).

Plaintiff alleges that his initial confrontation with Warden Sumlin about his complaints to the ACLU and FBI was on January 13, 2010, well more than one year before the filing of suit on May 5, 2011.  Many of the other alleged acts of retaliation are said to have occurred within a few days or weeks of that January date.  Retaliation claims based on those incidents are plainly untimely.  The Fifth Circuit, based on that untimeliness, specifically affirmed the dismissal of claims based on those incidents (damage to property, noxious paint fumes, threats from inmates, wrist fracture, false disciplinary charge) on the earlier appeal.  The Court held that the retaliation claim was not frivolous, but it did not address the timeliness of specific retaliation incidents.  It appears plain that those incidents

of which Plaintiff was well aware more than one year before he filed his complaint are untimely when asserted under the heading of a retaliation claim, just as they were when presented as stand-alone claims.  Accordingly, all retaliation claims based on events that occurred before May 5, 2010 should be dismissed.

The amended complaint and Plaintiff's deposition testimony describe some events that happened within the timeliness period.  For example, Plaintiff alleges that the warden stripped him of his protective custody status, wrongfully extended his disciplinary segregation from 30 days to five and one-half months, and housed Plaintiff with cellmates who presented serious physical danger to Plaintiff.  Plaintiff attributes these actions to Sumlin's retaliation against him for filing complaints with the FBI and ACLU.  Sumlin has not demonstrated why these events would be untimely, and he has not attacked them on the merits.  Accordingly, summary judgment should be denied with respect to retaliation claims against Warden Sumlin based on incidents that occurred on or after May 5, 2010.

Plaintiff does not allege that Assistant Warden Goodwin or Officer Banks are responsible for retaliation.  Defense counsel asked Plaintiff at his deposition to "talk about the ACLU" and asked what Goodwin or Banks did.  Plaintiff stated that neither man was even in the room at the time of the initial confrontation, and he did not identify any particular retaliation by either man.  Accordingly, Goodwin and Banks are entitled to summary judgment on the retaliation claim.

**Medical Care for Hernia**

###### A.  Introduction

Plaintiff alleges that he was denied adequate medical attention for a hernia.  This court originally dismissed the claim as prescribed.  Plaintiff argued on appeal that he had pleaded a continuing violation based on a failure to provide needed and requested medical attention. The Fifth Circuit vacated the dismissal of Plaintiff's claim because it was "not clear from the face of his complaint that the claim was prescribed."  Defendants' motion for summary judgment  attacks the claim as untimely and on the merits.

###### B.  Relevant Facts

###### 1. Plaintiff's Allegations

Plaintiff alleged that he tore a muscle in his abdomen in July 2009, before his arrest, which led to an inguinal hernia the size of a golf ball.  He was going to seek medical treatment for it, but he was arrested. Plaintiff alleged in his original complaint that, on numerous occasions from his arrival at the Detention Center on October 7, 2009 through his departure on July 18, 2010, he was denied medical care for ongoing medical issues that included the hernia.  Plaintiff's amended complaint (Doc. 12, pp. 6-8) elaborated on the claim.

Plaintiff alleged that he complained on numerous occasions to Detention Center Nurse Rachel Harris (not a defendant) that he needed treatment for his hernia, but she told him that the Detention Center does not treat pretrial detainees; if he wanted the State to pay for his

surgery, he should get convicted and be shipped to a DOC facility.  Plaintiff specifies that on November 20, 2009 he asked a Deputy Walker (not a defendant) if he could speak to the nurse about his hernia.  Walker reported that Nurse Harris said to tell Plaintiff that she wasn't going to do anything about the hernia and that he should stop asking.

Plaintiff alleged that he was assigned a top bunk upon admission to the jail.  On November 22, 2009, while climbing up to his bunk, he tore soft tissue in his abdomen, and the hernia grew to the size of his fist.  This caused an extremely painful burning sensation in the lower abdomen and made it difficult to walk or engage in normal activities.

Plaintiff alleged that he asked Walker two times for a request form to see one of the wardens, but Walker refused to bring a form.  Plaintiff had already submitted three request forms to see the nurse, but she refused to see him.  Plaintiff says he was provided Tylenol or Ibuprofen and a hernia belt.  His request to be reassigned to a bottom bunk was denied.

Plaintiff was eventually processed into the DOC system at Hunt Correctional Center, where a physician diagnosed his hernia.  He was then sent to David Wade Correctional Center, and officials at that prison took him to E. A. Conway Medical Center for hernia repair surgery in January 2011.  Plaintiff alleged that he since made a full recovery.

### 2. Plaintiff's Deposition Testimony

Plaintiff testified in his deposition that he was, from the beginning, assigned to the top bunk.  Plaintiff asked his original cellmate about changing bunks, but the cellmate replied, "Deal with it."  Plaintiff testified that he spoke to Major Banks "at least a dozen times" about

moving down a bunk.  Plaintiff said he did so almost every time Banks came through the area from "October 7, 2009 until probably June of 2010 after I was sentenced."  Counsel asked Plaintiff what Warden Sumlin did about medical care for the hernia.  Plaintiff answered, "He didn't – he didn't do anything.  He said he didn't care."  Counsel asked what Goodwin did about the hernia.  Plaintiff said, "Nothing ... he told me just get with the nurse."

Plaintiff was placed in different cells during this time, as discussed above, but he testified that he was assigned to the top bunk in every cell in which he was housed.  At one time, his cellmate was transferred so that Plaintiff was alone, and Plaintiff could use the bottom bunk.  That was also true when he was in a suicide cell for a time.  Plaintiff was specific that some of the time when he was forced to use the top bunk was in May 2010 and afterward.

Plaintiff alleged that he turned in papers seeking medical care for the hernia at least three times.  He said he also spoke to Nurse Harris, as well as Major Banks, as alleged in his amended complaint.  Plaintiff said he told them he had a hernia that made it hard to climb to the top bunk.  Banks allegedly replied, "No, you're fine where you're at.  You'll be alright. I'm not moving you."  Plaintiff said he told Banks that two of his cellmates had offered to swap bunks with him, but Banks told him that they were not swapping.  "You are assigned to the top and that's where you'll stay."  Banks retired from the prison, but not until after Plaintiff was transferred out.  Plaintiff testified that Nurse Harris told him pretrial detainees

did not "get stuff taken care of" until they were convicted and sent to a DOC camp.  Doc. 61, Exhibit 1, pp. 42-62.

### C. Analysis

#### 1.  Deliberate Indifference Standard

For a convicted prisoner or pretrial detainee to prevail on a claim that his medical care (or lack of care) violated the Constitution, he must prove that prison or jail officials were "deliberately indifferent" to his "serious medical needs."  Estelle v. Gamble, 97 S.Ct. 285, 291 (1976); Hare v. City of Corinth, 74 F.3d 633, 643 (5th Cir. 1996) (en banc).  Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind.  Estelle, 97 S.Ct. at 291-92.  Disagreement with the diagnostic measures or methods of treatment afforded by prison officials does not state a constitutional claim for indifference to medical needs.  Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

#### 2. Assistant Warden Godwin

Plaintiff offers no more than a general assertion that he sought help from Assistant Warden Godwin with regard to getting medical help related to his hernia.  Plaintiff says Goodwin told Plaintiff to get with the nurse.  That is a proper response to a request for medical care, and it cannot be the basis for a showing of deliberate indifference.  Goodwin is entitled to summary judgment on this claim.

### 3. Warden Sumlin

Plaintiff testifies that he went to Warden Sumlin for help with regard to his hernia, and Sumlin said that he didn't care. Plaintiff added that the nurse told him that he would not receive surgery or other care for his hernia because pretrial detainees in the Detention Center, over which Sumlin was in charge, did not "get stuff taken care of" until they were moved to a DOC prison. Plaintiff has presented testimony to indicate that medical professionals in Sumlin's facility were under instruction to not afford the type of care Plaintiff needed, apparently due to cost concerns. That is sufficient to create a genuine issue of material fact as to whether Sumlin was, by enforcing such a policy, deliberately indifferent to Plaintiff's serious medical need.

Sumlin states that he relied on medical personnel. Supervisory prison officials are entitled to defer to the judgment of medical professionals. See, e.g., Vasquez v. Dretke, 226 Fed. Appx. 338 (5th Cir. 2007) (warden was not deliberately indifferent when he deferred to the judgment of medical professionals who denied a prisoner dentures). But that is not what is alleged. Plaintiff presents evidence that the medical personnel at the facility were not exercising or acting on medical judgment. Rather, they denied care based solely on a policy against affording such treatment to pretrial detainees.

### 4. James Banks

Plaintiff can point to evidence (his deposition testimony) that he complained to Major Banks many times, virtually every time Banks walked through the area, about his need for

a bottom bunk due to his hernia pain.  Banks repeatedly denied the request, even when cellmates agreed to it, and apparently without seeking guidance from medical staff about the issue.

Plaintiff has presented evidence that creates a genuine dispute as to whether Banks was deliberately indifferent to a serious medical need.  That evidence depicts Banks as cruelly and without any apparent justification refusing to allow Plaintiff to be assigned a bottom bunk, despite Plaintiff's pleas that he suffered from a painful hernia that was aggravated by being forced to climb to a top bunk.  There is no competing evidence from Banks to hint at any justification for his multiple refusals.  There is also no indication that Banks acted based on the advice of medical staff. Banks is not entitled to summary judgment on this claim.

### 5. Timeliness

Defendants assert that the hernia-related claims are untimely.  "A defendant moving for summary judgment on the affirmative defense of limitations must prove that defense conclusively."  Janvey v. Democratic Senatorial Campaign Committee, Inc., 712 F.3d 185, 193 (5th Cir. 2013).

Plaintiff's original allegations did tend to mention dates outside the timeliness window, but those allegations have now been expanded upon and supplemented by Plaintiff's deposition testimony. Each of the times that Plaintiff spoke to each defendant about the hernia issue are not specified in that evidence.  But Plaintiff does testify that his hernia

problems continued through May 2010 and afterward, so some of the defendants' related actions were quite possibly within the timeliness window. Defendants cannot point to uncontested evidence that all of their rejections of Plaintiff's requests for medical care or bunk reassignment related to his hernia occurred more than one year before he filed suit, so they are not entitled to summary judgment dismissal of these claims based on the defense.

**Cold, Bronchitis, and Pneumonia**

### A. Relevant Facts

#### 1. Plaintiff's Allegations

Plaintiff alleged in his amended complaint (Doc. 12, pp. 19-23) that he suffered from a severe head and chest cold that, due to lack of treatment, developed into more serious health problems.  He alleged that there were extreme temperature changes in the dorm almost weekly, and he often had to inhale chemical spray that was used in the unventilated area. Plaintiff alleged that his medical care was delayed, but he did eventually receive a prescription from Dr. Hearn for a 10-day supply of Bactrim antibiotic and an albuterol inhaler.  Plaintiff alleged that the officers handed out the prescribed medication sporadically over the course of weeks.  He developed what he believed was bronchitis or pleurisy, and Dr. Hearn told him that he probably had walking pneumonia.  He alleged that this took place over the entire time of his stay.

## 2. Plaintiff's Deposition Testimony

Defense counsel questioned Plaintiff about this at his deposition.  Plaintiff agreed that he saw Dr. Hearn on May 10, 2010 about these complaints.  He repeated that she provided him Bactrim and an inhaler.  The Bactrim was supposed to be given twice a day for 10 days, but the deputies took more like 45 days to pass it out.  Counsel asked Plaintiff if he complained to anyone about the lack of medical care.  Plaintiff said he complained to "the deputies" when they would come through, and he would ask for his prescribed medication.  He said he was eventually taken to see Nurse Harris, who told him he had walking pneumonia.  Doc. 61, Exhibit 1, pp. 51-55.

Plaintiff testified that he did not talk to Assistant Warden Goodwin about this issue.  He said Major Banks told him to get with the nurse.  Warden Sumlin "said he didn't care if I was sick or dying" even though Plaintiff told Sumlin he thought he had bronchitis or walking pneumonia.  Plaintiff said Sumlin told him this after Plaintiff had been to see Dr. Hearn.  Plaintiff conceded that he knew before May 10, 2010 that he needed medical care, and that he had spoken to Warden Sumlin before that date about his need for care.  Exhibit 1, pp. 61-64.

## 3. Defense Evidence

Medical records from the Detention Center show that Plaintiff underwent a medical intake screening on October 12, 2009.  A line labeled Medical Diagnosis included kidney stones, dislocated back, and RIH (which might stand for right inguinal hernia).  Plaintiff

completed a request form on November 5, 2009 for medical care related to kidney stones, hernia, back out of place, and chest cold.  The response indicates that Nurse Harris examined Plaintiff on November 7 and administered a urinalysis.  Soon afterward, on November 9, 2009, Dr. Hearn prescribed Bactrim.  The record also contains prescriptions for albuterol, Zantac, and Doxycycline that appear to be dated May 10, 2010.  There is nothing else of significance in the Detention Center medical records filed by Defendants.

Warden Sumlin testifies in his affidavit that it is his policy that inmates be provided adequate and proper medical care.  He says there is a meaningful and functioning system for dealing with complaints from inmates about medical care.  He testifies that he "has no knowledge of any medical problem or medical complaint made by Donald M. Boswell concerning his medical care and treatment at the Claiborne Parish Detention Center."  Sumlin adds that he "relies upon evaluations performed by the medical staff employees" because he is not trained or qualified to evaluate an inmate's medical condition.

### B. Analysis

Plaintiff has not presented evidence with respect to this claim that could support a finding that any named defendant was deliberately indifferent to a serious medical need for cold-related medical care.  This is especially true with respect to Goodwin and Banks.  There is no indication that either of them denied a request for care or prevented Plaintiff from requesting help from the medical staff.

Plaintiff does offer evidence that, before and after Plaintiff saw Dr. Hearn, he complained to Warden Sumlin.  The warden allegedly told Plaintiff on one occasion that he did not care if Plaintiff was sick or dying.  Sumlin may have been unsympathetic, but he oversaw a facility that provided Plaintiff access to a nurse and physician to treat his cold-related complaints, and Dr. Hearn and the nurse did afford treatment more than once.

"Deliberate indifference is an extremely high standard to meet."  <u>Domino v. Texas Dept. of Criminal Justice</u>, 239 F.3d 752, 756 (5th Cir. 2001).  "[T]he plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" <u>Id</u>., quoting <u>Johnson v. Treen</u>, 759 F.2d 1236, 1238 (5th Cir. 1985).  Furthermore, the decision whether to provide additional treatment "is a classic example of a matter for medical judgment."  <u>Id</u>., quoting <u>Estelle</u>, 97 S.Ct. at 293.

There is no evidence that Sumlin stood in the way of the staff providing proper medical care for the cold issue.  Plaintiff may be unhappy that he had a serious cold and that his condition was not resolved before it became worse, but lack of success in the medical care that prison officials afford does not state a constitutional claim for indifference to medical needs.  Even a degree of care that might be medical malpractice under state law is not necessarily a constitutional violation.  <u>Estelle</u>, 97 S.Ct. at 293.  Warden Sumlin and the other two defendants are entitled to summary judgment on the merits of this claim, so any timeliness issues need not be discussed.

Accordingly;

IT IS RECOMMENDED that Defendants' Motion for Summary Judgment (Doc. 61) be granted in part and denied in part by entry of an order that provides as follows:

1.     With respect to the strip search claim, all claims against John Goodwin and James Banks are dismissed with prejudice.   The claim against Johnny Sumlin remains, but Plaintiff's lack of a physical injury precludes the recovery of compensatory damages for mental or emotional injury.

2.     With respect to the retaliation claim, all claims against John Goodwin and James Banks are dismissed with prejudice. The claim against Johnny Sumlin remains with respect to retaliation claims based on alleged acts of reprisal committed on or after May 5, 2010.  Any retaliation claim based on alleged acts of reprisal committed before May 5, 2010 are dismissed with prejudice as untimely.

3.     With respect to the hernia-related care claim, all claims against John Goodwin are dismissed with prejudice. The claims against Johnny Sumlin and James Banks remain.

4.     With respect to the cold-related care claim, all claims against Johnny Sumlin, John Goodwin, and James Banks are dismissed with prejudice.  No defendants remain with respect to this claim.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 18th day of August, 2016.



Mark L. Hornsby
U.S. Magistrate Judge